## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UL LLC, | CASE NO. |
| Plaintiff, | |
| v. | |
| AMERICAN ENERGY PRODUCTS, LLC and JUDE J. SHAO, | JURY TRIAL DEMANDED |
| Defendants. | |

## COMPLAINT

Plaintiff UL LLC ("UL" or "Plaintiff") by and through its attorneys, Greenberg Traurig, LLP, brings this Complaint against Defendants American Energy Products, LLC ("AEP") and Jude J. Shao ("Shao" and, collectively with AEP, "Defendants") and alleges as follows:

## NATURE OF THE CASE

1.      This is an action for trademark infringement, counterfeiting, and unfair competition under the Federal Trademark Act of 1946, known as the Lanham Act, 15 U.S.C. § 1051, et seq., and violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq., and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq., arising from Defendants' intentional, willful, and continuing infringement of UL's well-known certification and service marks, which UL has used continuously since at least 1906 in connection with providing product testing and certification services.  Defendants' willful infringement through its unauthorized use of UL's marks on Defendants' non-refillable, disposable gas fuel canisters causes a likelihood of confusion in the marketplace, and has caused immediate and irreparable harm to UL and its certification and service marks, as well as to

1

consumers. UL seeks, among other things, damages and an injunction prohibiting Defendants from their infringing use of the "UL" designation.

## THE PARTIES

2.      UL is a Delaware limited liability company located and doing business at 333 Pfingsten Road, Northbrook, Illinois 60062. UL is an affiliate of the UL family of companies, which have tested, inspected, and certified products, and developed safety standards for over a century. Some of the services offered by UL include: inspection, advisory services, education and training, testing, auditing and analytics, certification software solutions, and marketing claim verification.  Plaintiff UL owns the well-known UL-in-a-circle certification mark and variations thereof (the "UL Marks").

3.      Upon information and belief, AEP d/b/a Sky Blue Butane is a Texas limited liability company, with a principal place of business at 8710 Scranton Street, Houston, Texas 77075, and is in the business of manufacturing and selling non-refillable butane cartridges or canisters for use with portable gas appliances. Upon further information and belief, AEP makes butane canisters for companies such as The Coleman Company, an outdoor products and camping company.  AEP also manufactures, distributes and sells butane canisters under the name "Sky Blue Butane," including Sky Blue Butane Fuel Model SB-1 (the "Accused Products"), which AEP markets, sells and/or distributes to consumers through its online website, other online and "bricks and mortar" retailers such as Amazon.com, Target and Wal-Mart, and through small "mom and pop" retailers.  AEP's Accused Products are distributed and/or sold throughout the United States, including, upon information and belief, in Illinois and this judicial district.

4.      Upon information and belief, defendant Jude Shao ("Shao"), is an individual

residing in Houston, Texas.  Mr. Shao is a Chinese immigrant and naturalized U.S. citizen, who founded AEP in 2013, when he returned to the United States after serving a ten-year sentence for tax evasion in China.  Mr. Shao is also AEP's Chief Executive Officer and one of its Directors.

5.      Upon information and belief, AEP is the alter ego of Mr. Shao because AEP is a closely held corporation and Mr. Shao exercises exclusive or near exclusive control over the corporation's activities, and AEP is not adequately funded and/or did not observe appropriate corporate formalities.

6.      Upon information and belief, Mr. Shao either personally participated in or directed AEP's infringement of UL's well-known certification and service marks complained of herein.

## JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1338(a) and (b) because the claims address federal questions concerning the Lanham Act, 15 U.S.C. § 1121, trademark infringement of federally registered trademarks pursuant to 15 U.S.C. § 1114, and federal unfair competition pursuant to 15 U.S.C. § 1125(a).

8.      The Court has supplemental jurisdiction over the claims arising under the laws of the State of Illinois, pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal subject-matter claims that they form part of the same case or controversy and derive from a common nucleus of operative fact.

9.      This Court has personal jurisdiction over Defendants, because Defendants have transacted business in the State of Illinois and within this judicial district, made contracts substantially connected with this State, and committed tortious acts within, and directed to, this

3

State. Particularly, UL's claims for trademark infringement, counterfeiting, and unfair competition arise from harm sustained in the State of Illinois, including, upon information and belief, through the sale of Accused Products to customers located in Illinois. Upon information and belief, Defendants have purposefully directed activity at the State of Illinois by contracting with UL within the State of Illinois, and by transacting business with UL within the State of Illinois, regarding Defendants' usage of certification mark labels for nonrefillable gas fuel canisters. On further information and belief, Defendants are causing tortious injury in the State of Illinois by acts or omissions outside of the State of Illinois.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because, upon information and belief, a substantial part of the events or omissions giving rise to the claims occurred and are occurring in this District.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A. UL'S VALUABLE RIGHTS

11. Founded in 1894, the UL family of companies is one of the oldest certification organizations in the United States. The UL family of companies have tested, inspected, and certified products as well as developed safety standards for over a century.

12. UL's services include testing and certifying that representative samples of products satisfy applicable safety standards and providing follow-up testing and inspection services to confirm that manufacturers are in compliance.

13. UL is a global independent safety science company offering certification, validation, testing, inspection, advising, training, and auditing services for a variety of industries around the globe.

14. UL owns the well-known UL-in-a-circle certification mark  and variations

thereof (the "UL Certification Marks"). UL also owns the service mark UL (the "UL Service Mark").

15.     UL has been providing testing reports and certifying products that conform to UL's Standards for Safety since at least 1906. Since at least 1906, UL, including its affiliates and predecessors, have continuously used the UL Service Mark in interstate commerce.

16.     UL, including its affiliates and predecessors, has been testing products and authorizing use of the well-known UL Certification Marks on products that conform to UL's Standards for Safety in interstate commerce in the United States since at least 1937. UL's authorized customers have been using the UL Certification Marks on products offered for sale and distributed in interstate commerce since 1937.

17.     UL serves all members of the general public, including, but not limited to, consumers, manufacturers, suppliers, retailers, vendors, trade groups, industry associations, regulatory bodies, and governmental entities.

18.     UL's thousands of authorized customers have used UL's well-known UL Certification Marks on billions of household, consumer, commercial, and industrial products including refrigeration equipment, lighting products, cable, wiring, building materials, life safety vests, butane canisters, batteries and power packs for computers and consumer electronics, traffic signals, sprinklers, cash registers, and many more.

19.     Over the past century, UL including its affiliates and predecessors has promoted recognition of its certification programs through a wide variety of marketing channels on a national, regional, and local basis, including but not limited to television, radio, consumer and trade newspapers, consumer and trade magazines, industry trade journals, promotional literature, brochures, direct mail, email campaigns, and its interactive website located at <ul.com>. UL

also promotes its UL Certification Marks and the UL Service Mark through its participation in standards development activities, follow-up conformity assessment and inspection services, community involvement, and safety science research.

20. As a result of UL's extensive use of the UL Service Mark to promote its certification programs, including standards development activities, follow-up conformity assessment and inspection services, community involvement, and safety science research, the UL Service Mark and the UL Certification Marks have attained a national and global reputation for technical expertise and integrity and have become symbols of trust and objectivity.

21. The UL Service Mark and the UL Certification Marks are well-known and recognized by the general public, as well as by members of local, state and federal government regulatory bodies and industry trade associations, as marks indicating testing, inspection, validation, certification, training, advising, and auditing services originating with UL.

22. The UL Service Mark and the UL Certification Marks are renowned among the general public as symbols of UL's testing, inspection and certification services originating with UL, and have been renowned since long before Defendants began engaging in the conduct alleged in this Complaint.

23. UL has duly and properly registered the UL Service Mark and the UL Certification Marks in the United States Patent and Trademark Office ("USPTO") on the Principal Register. UL owns the following federally registered marks, among others. Copies of these registrations, or their corresponding USPTO website pages, are attached as Exhibits 1 through 3.

| Mark | Reg. No. | Exh | Type |
|------|----------|-----|------|
| (UL logo) | 782,589 | 1 | Certification Mark |
| (UL logo) | 2,391,140 | 2 | Certification Mark |
| UL | 4,201,014 | 3 | Service Mark |

24.     The federal trademark registrations referenced above are valid and subsisting, and provide conclusive evidence of the right of UL to use the UL Service Mark and authorize the use of the UL Certification Marks in commerce.

25.     UL certifies the products of others in a variety of industries (the "Certification Services") under its UL Certification Marks (Exhibits 1-2), and offers educational, business advisory, product safety testing, and public safety services (the "UL Services") under the UL Service Mark (Exhibit 3).

26.     Use and registration of the UL Certification Marks and the UL Service Mark establish that UL has senior trademark rights in the UL Certification Marks and the UL Service Mark, and consequently there is no question of priority of rights, as such priority belongs to UL.

27.     UL's United States Trademark Registration Nos. 2391140 and 782589 referenced above are incontestable under 15 U.S.C. § 1115(b).   As such, UL's incontestable federal trademark registrations confer exclusive use of the UL Certification Marks throughout the United States in connection with the UL Certification Services.

28.     UL has extensively used the UL Service Mark and has advertised, promoted, and offered the UL Services under the UL Service Mark in interstate commerce through various

7

channels of trade.  As a result, the customers and potential customers of UL, and the public in general, have come to know and recognize the UL Service Mark as identifying the UL Services as services of the highest quality offered by UL, and associate the UL Service Mark with the UL Services.  UL has thus built up extensive and invaluable goodwill in connection with the sale of its services offered under its UL Service Mark.

## B.    THE IMPORTANCE OF CERTIFYING BUTANE CANNISTERS

29.    Nonrefillable, disposable metal container assemblies, charged with commercial grade hydrocarbon fuel gas (such as butane), are subject to extensive federal regulation.   For instance, Code of Federal Regulations, Title 49, 178.33-8 and 178.33(a)-8 govern the construction, charging and marking of these containers.   Standards and codes, such as the Liquefied petroleum Gas Code, NFPA 58, govern the use of these containers and require that the fuel gas is odorized.  The U.S. Department of Transportation has regulations covering the types of safety-related markings required on such containers.   These regulations and standards are designed to protect the safety of businesses and consumers and require, for example, that such container assemblies have a pressure relief system to prevent propulsion of the containers when exposed to fire and that the fuel gas used in such canisters is odorized to enhance leak detection. Inferior components, faulty manufacturing, and/or improper installation can lead to premature and sometimes catastrophic failure, including explosions and fire hazards.   Such failures can cause serious bodily injury and death.   The explosion and fire risks associated with non-compliant butane canisters can also lead to significant property damage.   U.S. regulations surrounding the production of butane fuel canisters are more stringent than in other countries, leading to safer and higher quality products.

30.    UL tests butane canisters for compliance with UL 147B, "Standard for Safety For

Nonrefillable (Disposable) Type Metal Container Assemblies for Butane" when certifying such products for UL listing.

31.     The presence of a label that bears the UL Certification Mark on a butane canister is the manufacturer's representation to the public that the canister meets the requirements of "UL Standard for Nonrefillable fuel gas container for butane, UL147B," that UL has performed the applicable compliance testing, and has issued a certification.

32.     Proper labeling with the UL Certification Mark is the only method provided by UL to identify UL-certified butane canisters.

33.     Authorized UL labels for butane canisters ("UL Canister Labels") contain the following elements: (i) the UL Certification Mark; (ii) the word "LISTED" in capital letters below the UL Certification Mark; (iii) a description of the certified product, and (iv) the UL control number.  An example is shown below:



## C.     THE GLOBAL SERVICES AGREEMENT

34.     As part of its marketing strategy for its Blue Sky Butane products, AEP sought certification from UL that its butane canisters met applicable safety standards.  Thus, in or about January 2014, AEP requested a quotation from UL to obtain certification from UL that its butane canisters met applicable safety standards.  *See* Quotation for Service, attached as Exhibit 4.

35.     AEP accepted the quote and entered into a Global Services Agreement ("GSA") with UL on March 12, 2014, regarding testing and certification of nonrefillable fuel gas

containers for butane.  *See* GSA, attached as Exhibit 5. Specifically relating to AEP's rights to use the UL Marks, the GSA provides: "[e]xcept for your rights specifically granted in a Service Agreement to use the Marks, you have no rights in the Marks." Ex. 2, GSA, Section 8.  The GSA contains a governing law provision stating that "This [Global Services] Agreement shall be governed by the laws of the State of Illinois, United States of America, without reference to its choice of law principles."  *Id*., Section 22.  The GSA (and incorporated Quotation for Service) also incorporates Follow-Up Service Terms, accessible on UL's website.  *See id*. at Sections 1-2; Ex. 2, Quotation for Service.

36.     Essentially, the GSA, the Quotation for Service, and the Follow-Up Service Terms required AEP's compliance with a multi-step process before it could rightfully use the UL Marks.  Two of the steps are most relevant here: First, AEP was required to submit representative samples of its product for extensive testing by UL, so that UL could determine preliminary eligibility for use of the UL Marks. Where provision of services requires examination of sample products, AEP was obligated to provide the sample products under the GSA at its own cost.  *Id*. at Section 6.

37.     Once UL determined eligibility, AEP could only place UL Marks on its products during the manufacturing process after UL performed an Initial Product Inspection ("IPI") and Follow-Up Service ("FUS") to verify compliance across the manufactured products.   The Follow-Up Service Terms provide:  "Initial Product Inspection.  Before UL Contracting Party authorizes Use of the UL Mark by Subscriber with respect to a Product, UL Contracting Party *reserves the right* to conduct an IPI to determine whether a sample or samples of the Product conform to UL Requirements."  Follow-Up Service Terms, attached as Exhibit 6, at 3 (emphasis added).  The GSA expressly prohibited AEP from distributing products bearing the UL Marks

before an IPI was successfully completed, even if UL found initial compliance of AEP's product samples with the applicable standards. *See* Ex. 1, Section 1-2; Ex. 3, at 3.

38. UL quickly moved AEP's products through this multi-step process. On October 15, 2014, UL issued its Report on Nonrefillable Disposable Type Metal Container Assemblies for Butane to AEP. Report, attached as Exhibit 7.

39. On the next day, October 16, 2014, UL LLC issued its Certificate of Compliance to AEP. Certificate of Compliance, attached as Exhibit 8. That same day, UL reminded AEP, by letter to its CEO Mr. Shao, that AEP did not have authority to use the UL Mark until it passed an IPI, stating:

> PLEASE NOTE: YOU ARE NOT AUTHORIZED TO SHIP ANY PRODUCTS BEARING ANY UL MARKS UNTIL THE INITIAL PRODUCTION INSPECTION HAS BEEN SUCCESSFULLY CONDUCTED BY THE FIELD REPRESENTATIVE.
>
> An Initial Production Inspection (IPI) is an inspection that must be conducted *prior to the first shipment of products bearing the UL Mark.* This is to ensure that products being manufactured are in accordance with UL's requirements including the Follow-Up Service Procedure. After the UL Representative has verified compliance of your product(s), authorization will be granted for shipment of product(s) bearing the appropriate UL Marks as denoted in the Procedure.

*See* UL Letter to AEP, attached as Exhibit 9 (emphasis added); *see* Ex. 5, at 21 ("The description and test result in this Report are only applicable to the sample(s) investigated by UL and does not signify UL certification or that the product(s) described are covered under UL's Follow-Up Service Program").

40. Four days later, on October 20, 2014, Mr. Shao acknowledged that AEP was required to successfully complete an IPI. Mr. Shao further informed UL that "[r]egarding the initial inspection we are still working out the kinks on our automated lines so it is hard to say when we can start the full production. But we will let you know at least two weeks in advance

before we go into production."

**D. DEFENDANTS' WRONGFUL CONDUCT**

41.     On November 14, 2014, UL visited AEP's Houston facility in November 2014,

UL determined there were several issues with AEP's Sky Blue butane canisters, including

improper placement of the UL Mark and UL's inability to verify construction of the canisters at

AEP's site.  Specifically, UL learned that while AEP's butane canisters were filled with butane

at its Houston facility, the canisters were manufactured at another facility.  This necessitated a

"split inspection," so that UL could inspect the entire manufacturing process for AEP's butane

canisters at the various locations where they were assembled.  *See* Ex. 4, at 3 ("Follow-Up

Service Inspections. . . . UL Contracting Party representatives will make periodic examinations  .

. . at facilities where such Covered Product is manufactured.").  After the November 14th

inspection, UL informed Mr. Shao that AEP was not authorized to distribute any canisters

displaying the UL Mark until these additional inspections were completed.

42.     In the meantime, on December 17, 2014 and March 10, 2015, UL issued

inspection reports to AEP, which stated that no products were examined and reminding AEP

that:

> Authorization to use the UL Mark is contingent upon a regular countercheck of the
> products intended to be the UL Labeled to ensure compliance to UL requirements.  Since
> there was no completed UL Labeled production at the time of this inspection, please call
> [Clint Ferguson] as soon as the next production date or dates are known, so that a UL
> inspection can be conducted prior to the next shipment of UL Marked Product.

Inspection Reports, attached as Exhibits 10 and 11.

43.     On March 10, 2015, Mr. Shao informed UL that AEP was "not producing any

Listed product that needs to be inspected."  As a result of Mr. Shao's information, on March 12,

2015, four months after UL's first attempted inspection, UL put AEP on "on-call" status.  On-

call status terminated the quarterly inspections in favor of annual inspections until AEP informed UL that it was producing product and ready for UL to conduct an IPI.  UL did this to save AEP from incurring unnecessary inspection fees.

44.     On April 15, 2015, Mr. Shao contacted UL confirming AEP's on-call status and acknowledging that AEP had not successfully completed an IPI. Mr. Shao further told UL that "[i]f and when we begin to produce the product bearing the UL Listed marks, we should call you for quarterly inspections."  Mr. Shao never contacted UL after April 15, 2015 to inform UL that AEP started producing butane canister products, let alone products bearing UL Marks.

45.     Evidently, Mr. Shao independently decided sometime later that AEP no longer needed to adhere to its contractual obligations under the GSA and Follow-Up Service Terms before using the UL Mark because when UL visited AEP's facility again in October 12, 2015, it learned that AEP had butane canisters in its inventory bearing the UL Mark despite the fact that AEP had not completed or requested an IPI and was not authorized to use the UL Mark.  Later that same day, UL notified Mr. Shao that it had identified AEP butane canisters bearing an unauthorized UL Mark.  UL also issued a Variation Notice that day, indicating that the product manufactured by AEP was not in compliance because: AEP was using a different part number than that previously approved, and because the mark was missing a control number.  *See* Variation Notice, attached as Exhibit 12.  That Variation Notice specifically stated: "Existing product to be reworked, scrapped and/or labels removed.  No additional use of UL Mark with this construction," "Use of UL mark on affected product must be discontinued," and "It is the manufacturer's responsibility to assure that this variation in requirements be evaluate and found acceptable by UL before shipping any UL Marked products in production or in inventory."  *See id.*

46.     The day after, on October 13, 2015, UL issued a second Variation Notice to identify a third way in which AEP's product was not in compliance with UL's requirements. The second Variation Notice identified that the butane canister was being manufactured at a different facility than AEP had originally identified.  Variation Notice, attached as Exhibit 13. That Variation Notice also stated, "shipment of any affected UL Marked product must be suspended until the variation has been resolved."  *Id.*  The Variation Notices made it clear that AEP had no authorization to ship products bearing UL Marks in the absence of an IPI finding the products to be in compliance with UL's Requirements.

47.     On October 15 and 20, 2015, UL asked Mr. Shao what corrective action plan AEP was going to take to be in compliance with UL's requirements.   Acknowledging his understanding that AEP's manufacture of the butane canisters was not in compliance, Mr. Shao explained that AEP's butane canisters were actually manufactured by Ball Corp in at least two locations.

48.     Despite UL's unannounced visit, the issuance of two Variation Notices, and numerous follow up emails, Defendants were not deterred from continuing to ship products bearing the unauthorized UL Marks.

49.     On November 23, 2015, UL made another unannounced visit to AEP's Houston facility.  During that visit, UL again observed that AEP was still manufacturing butane canisters bearing the UL Mark.  Later that same day, UL issued a third Variation Notice, noting that AEP's canisters were not in compliance because they used the wrong part number, were missing a control number and were being manufactured in a facility not previously approved by UL. Variation Notice, attached as Exhibit 14.  That Variation Notice stated, "[u]se of UL mark on affected product must be discontinued," "[e]xisting product to be reworked, scrapped and/or

14

labels removed. No additional use of UL Mark with this construction," "[i]t is the manufacture's responsibility to assure that this variation in requirements be evaluate and found acceptable by UL before shipping any UL Marked products in production or in inventory," and "shipment of any affected UL-Marked product must be suspended until the variation has been resolved." *Id.*

50. In response, and in continued acknowledgement that AEP had not passed an IPI and did not have authority to use the UL Mark, Mr. Shao contacted UL on November 25, 2015, with a proposed work around, stating: "we will place a made in the USA mark in place of the UL mark on the can. Please review the attached proposed modification and let us know if that is acceptable to you." But AEP never implemented this workaround.

51. No closer to a resolution, in March 2016, AEP and UL traded communications about the need for a split inspection and correction of the items set forth in UL's Variation Notices. Nevertheless, AEP never resolved the variations identified by UL, no split inspection ever took place, and AEP never passed an IPI.

52. In April 2016, UL notified Mr. Shao for a third time that AEP had not taken corrective action to address the items outlined in the Variation Notices, had not completed an IPI, but yet continued to manufacture butane canister products bearing the UL Marks without authority.

53. On April 25, 2016, UL issued a fourth Variation Notice, which identified the issues of non-compliance contained in the third Variation Notice and also stated that "[u]se of UL mark on affected product must be discontinued," among other things. Variation Notice, attached as Exhibit 15. Meanwhile AEP continued to ship butane canister products bearing the unauthorized UL Marks with impunity.

54. On April 25, 2016, UL conducted an inspection at AEP's Houston facility and

found approximately 23,124 canisters bearing an incomplete UL mark that were boxed and ready to ship. In addition, UL identified another approximately 56,160 unfilled canisters bearing an incomplete UL mark in stock. Inspection Report, attached as Exhibit 16.

55.     On April 29, 2016, UL terminated the GSA with AEP. The termination letter stated in part:

> Termination of this service means that the UL Marks, designated UL Markings and any other references to UL may no longer be used on or in connection with any of the products previously covered by the above UL file and associated manufacturing locations. . . . Please contact the local UL filed representative . . . for this manufacturing location if there are questions regarding disposition of any UL marks in your possession associated with this file.

Termination Letter, attached as Exhibit 17. At that time, AEP still had inventory of butane canisters bearing counterfeit UL Marks. AEP never contacted UL to determine what to do with its remaining inventory and, instead, continued to sell its butane canister products bearing the counterfeit UL Marks.

56.     On July 20, 2016, UL sent a cease and desist letter to Mr. Shao, demanding that AEP immediately cease its unauthorized and counterfeit use of the UL Mark. Mr. Shao and AEP never responded and, instead, continued selling and shipping products bearing the counterfeit UL Marks to its customers throughout the United States, including those located in Illinois.

57.     Notwithstanding UL's exclusive rights in and to the UL Certification Marks and the UL Service Mark, and well after UL's adoption and registration of the UL Certification Marks and the UL Service Mark, AEP has been using a mark that is identical to or substantially indistinguishable from the UL Certification Marks (the "Counterfeit Mark") to falsely suggest that their butane canister products have been tested and certified by UL. Specifically, AEP is using a Counterfeit Mark on alleged UL 147B compliant butane canisters, when in fact those

butane canisters have never been tested or otherwise certified by UL.

58.     AEP was never authorized to use the UL Certification Marks and the UL Service Mark because it never satisfied UL's certification and inspection procedures.  AEP continued to manufacture and distribute butane canisters bearing the Counterfeit Mark even after UL had terminated the GSA with AEP.

59.     Even after sending its July 2016 cease and desist letter to Defendants, UL has learned that Defendants continued to sell butane canisters bearing the Counterfeit Mark to several retail outlets in the Houston and Dallas areas.  Similarly, UL learned that Defendants continued to accept and ship orders for butane canisters bearing the Counterfeit Mark from its direct customers throughout the United States, including customers located in Illinois. Examples of the counterfeit UL Labels identified as part of UL's investigation are shown below:

Images of AEP shipment of counterfeit butane canisters to Illinois customer in July 2016 where order for shipment was placed by phone and email to AEP







Image of Sky Blue Butane bearing Counterfeit Mark displayed for sale at Hong Kong Market Place in Dallas, Texas in August 2016



Image of Sky Blue Butane bearing Counterfeit Mark purchased by Illinois customer from Sky Blue Butane website in August 2016



Image of Sky Blue Butane bearing counterfeit mark advertised on www.skybluebutane.com in September 2017



60.     Upon information and belief, from at least January 2015 until late September 2017, Defendants advertised Sky Blue butane fuel canisters for sale on a website at <www.skybluebutane.com> using product images showing the Counterfeit Mark.   In late September 2017, Defendants shut down this website and replaced it with another site at <www.skybluebutane.com/new/> that displays a blue rectangular box where the Counterfeit Mark was previously displayed.

61.     Upon information and belief, AEP has used the Counterfeit Marks to deceive the applicable regulatory authorities into believing that AEP's butane canisters have been certified by UL and thus in compliance with governing federal rules, standards and codes.   Upon further information and belief, AEP's distributors, retail customers and consumers have purchased the butane canisters from AEP based at least in part on AEP's counterfeiting. This presents a potential public safety risk as the mechanical integrity of such butane canisters is unknown and falsely represented as being UL certified and in compliance with UL 147B.

62.     AEP has never had any authority to apply UL Marks to its butane canisters

because they never met UL's inspection requirements and, thus, were never authorized to ship products bearing the UL Label.

63.     AEP's use of the Counterfeit Mark is identical to and confusingly similar to the UL Certification Marks in appearance, sound, meaning, and commercial impression.

64.     AEP's butane canisters bearing a Counterfeit Mark falsely suggest that AEP's butane canisters have been tested and certified by UL as compliant with UL 147B.

65.     AEP's use of a Counterfeit Mark trades off the goodwill of the UL Service Mark and the UL Certification Marks and is without permission or license from UL.

66.     AEP advertises, distributes and sells its butane canisters in commerce using a Counterfeit Mark.

67.     AEP's butane canister products bearing a Counterfeit Mark have not been tested and certified by UL to any safety requirements, and as such, may place the health and safety of the public at risk.

68.     Upon information and belief, Defendants were engaged and continue to engage in a regular business of selling butane canisters bearing a Counterfeit Mark.

69.     Upon information and belief, Defendants use and intend to continue using a Counterfeit Mark without the authorization of UL, thereby confusing consumers as to the certification of the butane canisters by UL and resulting in damage and detriment to UL and its reputation and goodwill.

70.     Defendants knew or had reason to know of the UL Certification Marks and the UL Service Mark at the time Defendants commenced use of their Counterfeit Mark.  Defendants were on constructive notice of the UL Certification Marks and the UL Service Mark by virtue of their federal registration.  Defendants also had notice of the UL Certification Marks by virtue of

the GSA entered into by AEP and UL and numerous communications between UL and AEP after entering into the GSA.

71.     Upon information and belief, Defendants intentionally adopted and used the Counterfeit Mark so as to create consumer confusion and traffic off of UL's reputation and goodwill under the UL Certification Marks and UL Service Mark.

## COUNT ONE

### (Federal Trademark Infringement – 15 U.S.C. § 1114)

72.     UL repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

73.     Defendants' Counterfeit Mark is identical to or substantially indistinguishable from the UL Certification Marks and UL Service Mark in appearance, sound, meaning, and commercial impression, such that the use thereof is likely to cause (i) confusion, mistake, and deception as to the certification of Defendants' butane canisters, (ii) the public to be confused, deceived, and to assume erroneously that Defendants' butane canisters have been certified by UL or that Defendants are in some way connected with, licensed, authorized, certified by, or affiliated with UL, and (iii) irreparable injury and damage to UL and to the goodwill and reputation symbolized by the UL Certification Marks and the UL Service Mark.

74.     Likelihood of confusion is enhanced by the fact that the UL Certification Marks and the UL Service Mark are strong, well-known, and entitled to a broad scope of protection.

75.     Likelihood of confusion is also enhanced by the fact that the Counterfeit Mark, the UL Certification Marks and the UL Service Mark prominently incorporate the key component "UL."

76.     UL's United States Trademark Registrations set out above provide, at the very

least, constructive notice to Defendants of the rights of UL in and to the UL Certification Marks and the UL Service Mark.

77.     Defendants' use of the Counterfeit Mark in connection with the Defendants' butane canisters is likely to cause confusion, mistake, or deception of consumers as to the authorization or certification of the goods, in violation of the Lanham Act, including but not limited to 15 U.S.C. § 1114.

78.     Consumers are likely to purchase or engage Defendants' butane canisters being offered under the Counterfeit Mark, believing them to have been certified by UL, thereby resulting in a loss of goodwill and economic harm to UL.

79.     Upon information and belief, Defendants intentionally adopted and used the Counterfeit Mark so as to create consumer confusion and traffic off of UL's reputation and goodwill under the UL Certification Marks and the UL Service Mark.  Defendants have recklessly placed butane canisters into the marketplace which purport to have been tested by UL under appropriate safety standards, when in fact UL never performed any such testing on the butane canisters Defendants are selling.

80.     UL is informed and believes and on that basis alleges that Defendants have derived unlawful gains and profits from their infringing use of the Counterfeit Mark.

81.     The goodwill of UL's business under the UL Service Mark is of great value, and UL will suffer irreparable harm should Defendants' infringement be allowed to continue to the detriment of the trade reputation and goodwill of UL for which damage UL cannot be adequately compensated at law.

82.     UL has no control over whether the goods offered by Defendants meet the requirements of UL 147B.  Thus, the great value of the UL Certification Marks and the UL

Service Mark is subject to damage by an entity it cannot control.

83.     Unless Defendants are enjoined by this Court from so doing, UL will continue to suffer irreparable harm and injury to its goodwill and reputation.

84.     Upon information and belief, Defendants have engaged in acts of infringement, with knowledge of UL's exclusive rights in and to the UL Certification Marks and the UL Service Mark in connection with the Certification Services and the UL Services, and Defendants continue in such acts of intentional infringement, thus entitling UL to an award of treble damages, disgorgement of Defendants' profits, and attorneys' fees and costs in bringing and maintaining this action, pursuant to Section 35(b) of the Lanham Act, 15 U.S.C. § 1117(b).

## COUNT TWO

### (Counterfeit of Registered Mark – 15 U.S.C. § 1114)

85.     UL repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

86.     UL owns valid and incontestable United States Trademark Registrations for its UL Certification Marks, as set out above.

87.     Well before any of Defendants' actions complained of herein were committed, UL had continuously used the UL Certification Marks throughout the United States in connection with its Certification Services.

88.     Defendants use a non-genuine version of the UL Certification Marks and UL Service Mark that is identical to, or substantially indistinguishable from, the UL Certification Marks and UL Service Mark.

89.     The UL Certification Marks are registered on the Principal Register as a certification mark, and Defendants are intentionally using the Counterfeit Mark to falsely suggest

that UL has certified Defendants' butane canisters.

90.     UL did not authorize Defendants' use of the Counterfeit Mark, and such unauthorized use of the UL Certification Marks and UL Service Mark is likely to confuse consumers into falsely believing that Defendants' butane canisters are certified by UL when, in fact, they are not.

91.     Defendants' use of the Counterfeit Mark without consent from UL was and is a willful and intentional infringement of UL's registered UL Certification Marks and UL Service Mark.

92.     Defendants have profited from their acts of infringement.  UL is entitled to recover Defendants' profits arising from the infringement, any damages sustained by UL arising from said infringement, as well as the costs of this action.  UL also is entitled to an enhanced award of profits and/or damages to fully and adequately compensate it for Defendants' infringement.  At its election, UL also is entitled to statutory damages.

93.     Defendants have caused and, unless enjoined by this Court, will continue to cause irreparable injury to UL that is not fully compensable in monetary damages.  UL is therefore entitled to a permanent injunction enjoining and restraining Defendants from use of the UL Certification Marks and UL Service Mark or any other mark that is confusingly similar to the UL Certification Marks and the UL Service Mark.

## COUNT THREE

### (Federal Unfair Competition and False Designation of Origin and

### False and Misleading Representations – 15 U.S.C. § 1125(a))

94.     UL repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

95. Defendants' use of the Counterfeit Mark constitutes unfair competition and a false designation of origin or false or misleading description or representation of fact, which is likely to deceive customers and prospective customers into believing that Defendants' butane canisters offered for sale under Defendants' Counterfeit Mark have been certified by UL, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

96. Defendants' actions cause or are likely to cause confusion or mistake among the public as to the testing and certification of Defendants' butane canisters offered for sale bearing Defendants' Counterfeit Mark, or to confuse the public into believing that Defendants' butane canisters are otherwise affiliated, connected, associated with, or sponsored by UL, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

97. UL has no control over the nature and quality of Defendants' butane canisters offered for sale bearing Defendants' Counterfeit Mark. Any failure, neglect, or default of Defendants in providing goods has reflected, and will continue to reflect, adversely on UL.

98. Upon information and belief, Defendants intentionally adopted and used the Counterfeit Mark so as to create consumer confusion and traffic off of UL's reputation and goodwill under the UL Certification Marks and the UL Service Mark.

99. UL is informed and believes and on that basis alleges that Defendants have derived unlawful gains and profits from its infringement of the UL Certification Marks and the UL Service Mark.

100. The goodwill of UL's business under the UL Service Mark is of great value, and UL will suffer irreparable harm to its trade reputation and goodwill, should Defendants' acts of unfair competition and false representation and designations be allowed to continue.

101. UL has no control over the quality of the butane canisters offered by Defendants.

Thus, the value of the UL Certification Marks and the UL Service Mark is subject to damage by entities and individuals it cannot control. Unless enjoined by this Court from so doing, Defendants will continue to engage in acts of unfair competition, false representation and designation, to the irreparable damage and injury of UL.

102.     Upon information and belief, from the outset, Defendants have engaged in acts of unfair competition, false representation and designation, with knowledge of the exclusive rights of UL in and to the UL Certification Marks and the UL Service Mark, and Defendants continue in such acts of unfair competition and intentional false representation and designation, thus entitling UL to an award of its actual damages, disgorgement of Defendants' profits, and attorneys' fees and costs in bringing and maintaining this action, pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

## COUNT FOUR

### (Deceptive Trade Practices 815 ILCS 510/1 *et seq.*)

103.     UL repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

104.     The above-described conduct of Defendants constitutes deceptive trade practices in violation of 815 ILCS 510/1 et seq. insofar as it:

(a) passes off goods or services as those of another;

(b) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(c) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another;

(d)  represents  that  goods  or  services  have  sponsorship,  approval,  characteristics,

26

ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; and

(e) represents that goods or services are of a particular standard, quality, or grade;

105.    Defendants conduct constitutes deceptive trade practices in that their conduct in trade and commerce use and employ practices set out in Section 2 of the Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, and/or constitute the use and/or employment of deception, fraud, false pretense, false promise, misrepresentation and/or the concealment, suppression and/or omission of a material fact, with an intent that others rely upon the concealment, suppression or omission of such material act.

106.    Defendants have engaged in the above-described conduct willfully and deliberately and with full knowledge of UL's rights.

107.    Defendants' aforesaid conduct has caused and, unless and until such conduct is restrained and enjoined by this Court, will continue to cause great, immediate, and irreparable injury to UL, including irreparable injury to its reputation and goodwill.

108.    As the direct and proximate result of Defendants' statutory violations and other wrongful conduct, UL has suffered and will continue to suffer actual injury and the loss of money in an amount to be proven at trial.

109.    Defendants have realized revenue and profits by virtue of their wrongful conduct that they otherwise would not have obtained and to which they is not entitled.

110.    UL has no adequate remedy at law for Defendants wrongful conduct.

## **COUNT FIVE**

### **(Consumer Fraud and Deceptive Business Practices 815 ILCS 505/1 *et seq.*)**

111.    UL repeats and realleges each and every allegation contained in the preceding

27

paragraphs as if set forth herein in full.

112. The above-described conduct of Defendants constitutes deceptive business practices in violation of 815 ILCS 505/1 et seq. insofar as it:

(a) passes off goods or services as those of another;

(b) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(c) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another;

(d) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; and

(e) represents that goods or services are of a particular standard, quality, or grade;

113. Defendants wrongful conduct stated above constitute deceptive business practices in violation of 815 ILCS 505/2.

114. Defendants have engaged in the above-described conduct willfully and deliberately and with full knowledge of UL's rights.

115. Defendants aforesaid conduct has caused and, unless and until such conduct is restrained and enjoined by this Court, will continue to cause great, immediate, and irreparable injury to UL, including irreparable injury to its reputation and goodwill.

116. As the direct and proximate result of Defendants' statutory violations and other wrongful conduct, UL has suffered and will continue to suffer actual injury and the loss of money in an amount to be proven at trial.

117. Defendants have realized revenue and profits by virtue of its wrongful conduct

that it otherwise would not have obtained and to which it is not entitled.

118.    UL has no adequate remedy at law for Defendants wrongful conduct.

**ALLEGATIONS OF DAMAGE COMMON TO ALL CLAIMS FOR RELIEF**

119.    UL repeats and realleges each and every allegation contained in the preceding paragraphs as if set forth herein in full.

120.    UL has suffered, is suffering, and will continue to suffer irreparable harm and damage as a result of Defendants' wrongful conduct.  Defendants will, unless restrained and enjoined, continue to act in the unlawful manner complained of herein, all to the irreparable damage of the business and reputation of UL.  UL's remedy at law is not adequate to compensate it for the injuries suffered and threatened.

**PRAYER FOR RELIEF**

WHEREFORE, UL respectfully prays the Court:

A.    Enter a judgment in favor of UL and against Defendants, jointly and severally, on all Counts alleged herein;

B.    Designate this action an exceptional case entitling UL to an award of its reasonable attorneys' fees incurred as a result of this action, pursuant to 15 U.S.C. § 1117;

C.    Issue permanent injunctive relief against Defendants, and each of them, and their respective officers, agents, representatives, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with Defendants, enjoining and restraining them from:

> (i)    imitating, copying, or making any other infringing use of the UL Service Mark and the UL Certification Marks by the Defendants' Counterfeit Mark, and any other mark now or hereafter confusingly similar to the UL

Service Mark or the UL Certification Mark;

(ii)    manufacturing, assembling, producing, distributing, offering for distribution, circulating, selling, offering for sale, advertising, importing, promoting, or displaying any simulation, reproduction, counterfeit, copy, or colorable imitation of the UL Service Mark, the UL Certification Marks, Defendants' Counterfeit Mark, or any mark confusingly similar thereto;

(iii)    using any false designation of origin or false description or statement that can or is likely to erroneously lead the trade or public or individuals to believe that any good has been provided, produced, distributed, offered for distribution, circulated, sold, offered for sale, imported, advertised, promoted, displayed, licensed, sponsored, approved, or authorized by or for UL, when such is not true in fact;

(iv)    using the names, logos, or other variations thereof of the UL Service Mark, the UL Certification Marks, or Defendants' Counterfeit Mark in any of Defendants' trade or corporate names;

(v)    engaging in any other activity constituting an infringement of the UL Service Mark, the UL Certification Marks, or of the rights of UL in, or right to use or to exploit the UL Service Marks and the UL Certification Marks; and

(vi)    assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (i) through (v) above;

D.     Order Defendants, at their own expense, and subject to review by UL, to recall all products and marketing, promotional, and advertising materials that bear or incorporate Defendants' Counterfeit Mark, or any mark confusingly similar to the UL Certification Marks or the UL Service Mark, which have been manufactured, distributed, sold, or shipped by Defendants or on their behalf, and to reimburse all customers from which said materials are recalled;

E.     Order Defendants to immediately produce and turn over to UL's counsel, all products, labels, signs, prints, packages, molds, plates, dies, wrappers, receptacles, and advertisements in their possession or under its control, bearing the Defendants' Counterfeit Mark, and/or any simulation, reproduction, copy, or colorable imitation thereof, and all plates, molds, matrices, and any other means of making the same;

F.     Order Defendants to immediately supply UL with a complete list of entities to whom they distributed and/or sold products falsely bearing the UL Certification Mark as well as complete information regarding the sourcing and manufacture of Defendant's products bearing the Counterfeit Mark;

G.     Order expedited discovery to commence immediately;

H.     Order Defendants to publish notice to all customers or members of the trade who may have seen or heard of Defendants' use of Defendants' Counterfeit Mark, as well as to the appropriate regulatory bodies, which notice shall disclaim any connection with UL and shall advise them of the Court's injunction order and of Defendants' discontinuance from all use of Defendants' Counterfeit Mark;

I.     Order Defendants to file with this Court and to serve upon UL within thirty (30) days after service upon Defendants of an injunction in this action, a written report by

Defendants, under oath, setting forth in detail the manner in which Defendants have complied with the injunction;

     J.     Order Defendants to pay the costs of corrective advertising and any public, regulatory or other notices issued by UL;

     K.     Order Defendants to hold in trust, as constructive trustees for the benefit of UL, their profits obtained from their provision of the Defendants' butane canisters offered for sale under Defendants' Counterfeit Mark;

     L.     Order Defendants to provide UL a full and complete accounting of all amounts due and owing to UL as a result of Defendants' illegal activities;

     M.     Order Defendants to pay the general, special, actual, and statutory damages of UL as follows:

     (i)     UL's damages and Defendants' profits pursuant to 15 U.S.C. § 1117(a), trebled pursuant to 15 U.S.C. § 1117(b) for Defendants' willful violation of the federally registered trademarks of UL; and

     (ii)     If UL so elects, statutory damages of up to $2,000,000 per counterfeit mark, per type of product sold, offered for sale, or distributed, pursuant to 15 U.S.C. § 1117(c);

     N.     Order Defendants to pay to UL both the costs of this action and reasonable attorneys' fees incurred by UL in prosecuting this action, pursuant to 15 U.S.C. § 1117(a);

     O.     Award UL its prejudgment interest; and

     P.     Award such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

UL hereby demands a trial by jury of all triable issues raised by this Complaint.

DATED:  October 4, 2017        GREENBERG TRAURIG, LLP

                                        By: /s/ Jeffrey G. Mote
                                            Jeffrey G. Mote (6243534)
                                            Jacqueline V. Brousseau (6323680)
                                            GREENBERG TRAURIG, LLP
                                            77 West Wacker Drive
                                            Chicago, IL 60601
                                            (312) 456-1020
                                            motej@gtlaw.com
                                            brousseauj@gtlaw.com

                                          *Attorneys for Plaintiff UL LLC*