# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UL LLC, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 17 C 7178 |
| AMERICAN ENERGY PRODUCTS, LLC and JUDE SHAO, | ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

UL LLC sued American Energy Products, LLC (AEP) and its then chief executive officer Jude Shao, alleging violations of the federal Lanham Act and parallel state-law claims. All of UL's claims arise from the defendants' allegedly unauthorized use of UL's certification and service marks on butane containers sold by AEP. Both defendants previously moved to dismiss UL's claims, and the Court denied their motion. *See* dkt. no. 47. Defendant AEP then agreed to settle with UL. UL has now moved for summary judgment on its remaining claims against Shao, who is no longer AEP's chief executive officer. For the reasons stated below, the Court grants UL's motion.

## Background

The following facts are undisputed except where otherwise indicated.

**A.  Factual background**

UL is an Illinois-based company that tests products and certifies that they meet certain safety standards. Once certified, manufacturers are authorized to use the UL

marks on their products, which signals quality and enhances marketability. The certification process has two steps. First, the manufacturer submits a representative sample of its products to UL for testing. Second, UL initiates "follow-up services," which include "inspection . . . of Covered Products or manufacturing process(s) and of Manufacturing Locations." Pl.'s Rule 56.1 Stat., Ex. 6, Follow-Up Service Terms, dkt. no. 108-5, ¶ 2. The first stage of follow-up services is the "initial product inspection," which is designed to assess the production process itself, "commencing with the very first production run." *Id.* ¶ 9. After the initial inspection, follow-up services consist of periodic examinations of products and production processes to ensure ongoing compliance with UL standards.

AEP manufactured Sky Blue Butane canisters. In 2014, Shao sought UL certification on behalf of AEP to enhance the marketability of its product. The parties entered into a series of written agreements under which AEP agreed to submit representative samples for testing so that UL could determine whether the canisters were eligible to use its certification marks. After testing, UL indicated on October 16, 2014 that the samples provided by AEP satisfied safety standards. But, in a contemporaneous letter, UL expressly cautioned that AEP was not yet authorized to use UL's marks until an initial product inspection was completed. *See* Pl.'s Rule 56.1 Stat., Ex. 21, Letter to AEP Regarding Initial Product Inspection, dkt. no. 108-20 ("YOU ARE NOT AUTHORIZED TO SHIP ANY PRODUCTS BEARING UL MARKS UNTIL THE INITIAL PRODUCTION INSPECTION HAS BEEN SUCCESSFULLY CONDUCTED . . . . An Initial Production Inspection . . . must be conducted prior to the first shipment of products bearing the UL Mark.").

Four days later, on October 20, UL inspector Clint Ferguson sent Shao an e-mail seeking to schedule an initial product inspection and a training on follow-up services program called the "FUStart presentation." Shao responded that he was interested in the training but that an inspection was not warranted because AEP was still "working out the kinks" in its production process. *See* Pl.'s Rule 56.1 Stat., Ex. 22, Oct. 20, 2014 e-mail from Shao to Ferguson, dkt. no. 108-21. He specifically told Ferguson that he would give UL "at least two weeks" advance notice "before we go into production." *Id.*

Ferguson visited AEP fifteen days later, on November 4. According to an e-mail Ferguson sent Shao the same afternoon, during his visit Ferguson gave the FUStart presentation mentioned in the October 20 correspondence. But the parties dispute whether Ferguson also completed an initial product inspection on November 4. UL asserts that no production inspection was possible because, as Shao admitted, AEP was not in production at the time. *See* Def.'s Rule 56.1 Stat., dkt. no. 122, ¶ 35. UL also points to an e-mail Ferguson sent to another UL employee the same afternoon. In that message, Ferguson told Tim Crews that he had given the FUStart presentation but that he had come across "a few problems." *See* Pl.'s Rule 56.1 Stat., Ex. 23, Nov. 4, 2014 e-mail from Ferguson to Crews, dkt. no. 109-22. Chief among them, Ferguson discovered that the canisters AEP used in its production process were actually manufactured—and marked with the UL label—at another facility, meaning that UL would "need a split inspection" of both locations. *Id.* UL also notes that Shao's own e-mail scheduling the visit, sent only fifteen days earlier, represented that he would give UL "at least two weeks" advance notice before scheduling an initial inspection.

For his part, Shao asserts that a complete initial product inspection occurred. He

3

insists that, although "AEP had already completed its initial production and was not in full production" on November 4, Ferguson nevertheless "inspected AEP's initial product and examined AEP's machinery and equipment, automated production lines, manufacturing process, and quality control plan at the time."  Def.'s Rule 56.1 Stat., dkt. no. 122, ¶ 35.  In Shao's view, those actions amounted to a complete initial product inspection.  And he suggests that Ferguson's follow-up e-mail entitled "FUStart" was intended to "announce the start of UL's Follow-Up Services" upon the completion of the initial inspection, further supporting Shao's assertion that the inspection occurred.  Def.'s Br. in Opp. to Pl.'s Mot. for Summ. J., dkt. no. 121, at 8.  UL counters that, even accepting that Ferguson's e-mail announced the start of follow-up services, the relevant contract defines the initial product inspection as the first step of follow-up services, meaning that an email acknowledging the start of those services would not imply that an initial inspection had already occurred—if anything, it would imply than an initial inspection was impending.

Ferguson visited AEP twice more in the following months.  In December 2014 and March 2015 he visited AEP's facility and issued reports to AEP stating, in relevant part, that he could not inspect production because there was "no completed UL labeled production at the time of inspection."  Pl.'s Rule 56.1 Stat., Exs. 25-26, Inspection Reports, dkt. nos. 108-24, 25.  These reports made clear that AEP was "required to contact [Ferguson] prior to any UL production."  Id.

On March 10, Shao confirmed to Ferguson via e-mail that AEP was "not producing any Listed product that needs to be inspected."  Pl.'s Rule 56.1 Stat., Ex. 20, Mar. 10, 2014 e-mail from Shao to Ferguson, dkt. no. 108-19.  After Ferguson's third

4

apparently unsuccessful attempt to inspect AEP's production, UL moved internally to put AEP on "on-call" status, which requires less frequent inspections and correspondingly lower fees, until it began production of UL-labeled products. See Pl.'s Rule 56.1 Stat., Ex. 27, Mar. 12, 2014 e-mail from Neumeier to Ferguson, dkt. no. 108-26. Shao confirmed in mid-April that he understood AEP had been moved to on-call status and that that the company was subject to annual inspection to ensure that it was "not producing the products bearing UL Listed marks." Pl.'s Rule 56.1 Stat., Ex. 28, Apr. 15, 2014 e-mail from Shao to Ferguson, dkt. no. 108-27.

But it turns out AEP was using the UL marks all along. UL alleges that it discovered this when Ferguson visited AEP in October 2015, several months after AEP was placed into on-call status, and observed a large number of canisters bearing the UL mark. He e-mailed Shao to inform him that use of the marks was not allowed because AEP was still on call. An additional inspection in November 2015 resulted in another notice that AEP was noncompliant. Ferguson directed AEP to immediately scrap the UL-labeled canisters or cover the UL marks before shipping the products for sale. AEP apparently agreed to do so and in November 2015 proposed placing a "made in the USA" label over the UL mark.

Shao does not deny that AEP sold UL-labeled products. He argues, however, that AEP was permitted to do so. Specifically, he asserts that an initial product inspection occurred on November 4, 2014 and that use of the marks was therefore bona fide and legitimate. And Shao contends that the sales of UL-marked products after Ferguson's warnings that it must desist were also lawful, because the products had been *manufactured* during the period AEP was permitted to use the marks.

5

The undisputed record reveals that AEP in fact began using the UL marks long before Ferguson's discovery. Indeed, it used the marks in its initial production run even before Ferguson's first visit on November 4, 2014. And it continued to use the marks after Ferguson's October and November 2015 warnings that it must desist. Shao insists that these subsequent sales of product bearing UL marks consisted only of canisters that had been manufactured "during the time AEP was authorized" to use the mark. Def.'s Rule 56.1 Stat., dkt. no. 122, ¶ 58. AEP's sales of UL-labeled products continued as late as October 2016, a full year after Ferguson's communication with Shao.

UL asserts that when the canisters were manufactured is immaterial. First, it disputes that AEP was ever authorized, contending that no initial inspection was ever completed—on November 4, 2014 or on any other date. UL contends that Shao repeatedly and untruthfully represented that no UL-labeled products were being manufactured. And, even if there was a period of time during which "use" of the UL label was permitted, UL contends that AEP would not have been permitted to continue sales of marked products after the contract lapsed because the follow-up services agreement itself defined "Use of the UL Mark" to include *not only* manufacturing, but also "sale, delivery, shipment, distribution or promotion of any Covered Product bearing a UL Mark." Pl.'s Rule 56.1 Stat., Ex. 6, Follow-Up Services Terms, dkt. no. 108-5, ¶ 6.

In any case, the parties appear to agree that AEP sold at least $634,460—perhaps significantly more—of Sky Blue butane canisters bearing the UL marks during the relevant period. It made a profit of about 20 percent on those sales.

**B.    Procedural history**

UL sued AEP and Shao alleging they violated the Lanham Act and state law by

6

using UL's marks in connection with their products. After the Court denied AEP's motion to dismiss, it settled with UL. Shao, however, did not settle and says he resigned from his role with AEP to pursue this litigation. UL now moves for summary judgment on the remaining claims against Shao. Counts 1, 2, and 3 allege federal trademark infringement; count 4 alleges deceptive trade practices under Illinois law; and count 5 alleges consumer fraud under Illinois law.

In response to this motion, Shao contends that UL has fabricated its entire suit. Indeed, he alleges that UL filed this action at the behest of AEP's competitors in the consumer butane gas sector in order to undermine AEP. And, among other things, he alleges that UL has forced or encouraged its employees to commit perjury in their testimony in an effort to create a record upon which he could be held liable. The evidence Shao cites in support of these assertions is limited, for the most part, to his own declaration and the complaint from a lawsuit he and AEP filed against UL in Texas state court before UL filed the present suit.

## Discussion[1]

Summary judgment is proper where there is no genuine dispute regarding any

---

[1] Although the parties do not at this stage dispute personal jurisdiction, the Court reiterates here that Shao established sufficient contacts with Illinois to "connect[ ] him to the forum state in a meaningful way." See *Walden v. Fiore*, 134 S. Ct. 1115, 1125 (2014). Shao repeatedly reached out to UL, an Illinois company, about establishing a contractual relationship; he visited Illinois in furtherance of establishing the business relationship; he directed that AEP products be shipped to Illinois for inspection; and he shipped a significant amount of the allegedly trademark-infringing product to Illinois retailers for sale to the public. These are far more than the connections deemed insufficient by the Seventh Circuit in *Advanced Tactical Ordinance Systems, LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 802 (7th Cir. 2014), because here the "defendant himself create[d]" significant contacts with Illinois that directly gave rise to the present suit. *Walden*, 134 S. Ct. at 1122 (internal quotation marks omitted).

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Nicholson v. City of Peoria*, 860 F.3d 520, 522 (7th Cir. 2017). In assessing a motion for summary judgment, the Court views all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Carson v. Lake County*, 865 F.3d 526, 532 (7th Cir. 2017). Unlike a motion to dismiss, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), this standard remains substantively unchanged where the nonmoving party is a pro se litigant, with the one added requirement that the moving party must notify the pro se litigant of Rule 56's requirements, *see Timms v. Frank*, 953 F.3d 281, 285 (7th Cir. 1992); *Johnson v. City of South Bend*, 680 F. App'x 475, 479 (7th Cir. 2017) (explaining that, "in short," a pro se litigant must be notified of the requirement of Rule 56 "that he cannot rest on his pleadings" (internal quotation marks omitted)).

When a plaintiff that bears the burden of proof on its own claim moves for summary judgment, as UL does here, it may prevail only if it can "lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Retirement Fund*, 778 F.3d 593, 601 (7th Cir. 2015).

Based on the undisputed facts presented in the record, the Court concludes that no reasonable jury could find in Shao's favor and that UL is therefore entitled to summary judgment.

**A.    Trademark infringement and counterfeiting liability**

UL alleges trademark violations under 15 U.S.C. § 1114, unfair competition

under 15 U.S.C. § 1125(a), and parallel state law violations.[2] UL alleges that Shao counterfeited the UL marks within the meaning of the trademark statue. 15 U.S.C. §§ 1116(d), 1127. That is, it alleges that the labeling Shao unlawfully used was "identical with, or substantially indistinguishable from" the UL marks. *Id.* § 1127.

"Each of the claims at issue in this motion involves the same elements and proofs." *KJ Korea, Inc. v. Health Korea, Inc.*, 66 F. Supp. 3d 1005, 1012 (N.D. Ill. 2014). To prevail on each of its theories, UL must demonstrate that that: (1) it has a protectable right in the asserted trademarks; and (2) the defendant's use of the marks is likely to cause confusion. *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673-74 (7th Cir. 2001).

The Seventh Circuit has enumerated seven factors helpful for assessing likelihood of confusion. *See id.* at 677-78. Three are particularly relevant here: the similarity of the marks; the strength of the plaintiff's mark; and whether the defendant intended to "palm off" his product as that of the plaintiff. *Id.* In *CAE*, the Seventh Circuit confronted facts similar to those presented here; the plaintiff sued the defendant for using a mark that was undisputedly "virtually identical" to the protected mark. *Id.* at 678. And, as in *CAE*, there is no dispute that UL's mark is both protectable and quite strong. *See id.* at 684-85. Indeed, one of the leading trademark treatises uses the UL mark as a quintessential example of a "quality goods and services" certification mark. *See* 1

---

[2] UL's Illinois state-law claims allege deceptive trade practices in violation of 815 Ill. Comp. Stat. 510/1 and consumer fraud and unfair business practices under 815 Ill. Comp. Stat. 505/1. Both claims are subject to precisely the same standards as the federal infringement claims. *See AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 619 (7th Cir. 1993) (describing these state-law claims as "mirror[ing] our infringement analysis"). Therefore, for the same reasons the trademark claims are fit for summary judgment, so too are the state-law claims.

McCarthy on Trademarks and Unfair Competition § 4:8 (5th ed.). Finally, the alleged infringer's intent is also relevant to the likelihood of confusion. *CAE*, 267 F.3d at 686. As discussed below, the record before the Court establishes beyond question that Shao acted willfully. Taking these and the other factors from *CAE* together, the Court concludes that any reasonable jury would have to find that Shao's use of perfect copies of UL's marks to enhance the marketability of AEP's products was likely to cause consumer confusion. Indeed, Shao's use constituted counterfeiting under the Lanham Act. *See* 15 U.S.C. § 1116(d).

Shao does not meaningfully contest either of the elements of infringement. Rather, his defense rests on a single factual issue that he claims is disputed: whether there was an initial product inspection on November 4, 2014. Shao contends, without evidentiary basis, that Ferguson conducted an initial inspection during his November 4 visit, that AEP's subsequent use of the UL marks was lawful, and that UL has repeatedly lied to create a record to the contrary. UL disputes that an initial inspection was ever conducted. And, indeed, all of the contemporaneous evidence strongly supports UL's position. Internal communications from Ferguson about the November 4 visit, Shao's own responses to Ferguson's efforts to schedule an initial inspection, and the contents of notices generated after Ferguson's December 2014 and March 2015 visits to AEP all unquestionably indicate that no initial product inspection occurred on November 4—or, indeed, on any other date—and that AEP thus never satisfied the preliminary requirements for use of the UL mark.

The record one-sidedly favors UL. In fact, Shao's only bases for his contrary assertion are (1) his own declaration in support of this motion and (2) unreasonable

inferences he claims follow from contemporaneous evidence—namely, that Ferguson's e-mail about follow-up procedures after the November 4 visit signaled that an initial inspection had already been completed.

A "dispute about a material fact is 'genuine'" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Even drawing all reasonable inferences in Shao's favor, his conclusory averments in a declaration prepared for litigation do not provide a basis upon which a reasonable jury could find in his favor. And it would be unreasonable to infer that an e-mail about the start of follow-up services establishes that an initial product inspection already occurred because, as noted previously, that inspection is contractually defined to be part of those services.

Despite Shao's efforts to cast himself as an innocent, excusable infringer—repeatedly reminding the Court that AEP was an American business and asserting (without evidence) that UL is acting at the behest of shadowy foreign overlords—his defenses fall flat. As the Seventh Circuit has held, a defendants' reputation or citizenship does not give him "a license to steal trademarks from large nonresident corporations, and the amount of harm that the infringer inflicts goes to the amount of damages rather than to his liability for damages; the trademark laws do not excuse modest infringements by petty pirates." *See Gen. Elec. Co. v. Speicher*, 877 F.2d 531, 537 (7th Cir. 1989); *see also Louis Vuitton, S.A. v. Lee*, 875 F.2d at 584, 589 (7th Cir. 1989) ("'Equity' is not a roving commission to redistribute wealth from large companies to small ones. The Lanham Act was not written by Robin Hood.").

The record establishes that Shao counterfeited a perfect copy of UL's mark to

enhance the marketability of AEP's products and that such use was likely to cause consumer confusion. He did so without meeting the prerequisites for authorization from UL. And, based on this record, no reasonable jury could conclude otherwise.

**B.    Willfulness**

Next, UL contends that Shao's misuse of its marks was willful. The Court has little trouble concluding that any reasonable jury would have to agree. The willfulness of a defendant's infringement is significant because, under the Lanham Act, a willful infringer is subject to greater statutory damages. *See* 15 U.S.C. § 1117(c). It is not necessary to produce direct evidence of willfulness to satisfy the statute. Rather, "it is enough for these purposes that the defendant failed to inquire further because he was afraid of what the inquiry would yield. Willful blindness is knowledge enough." *Louis Vuitton*, 875 F.2d at 590.

Shao was repeatedly informed that he was not authorized to use the UL marks unless and until an initial product inspection was completed. The record establishes that no such inspection ever occurred. As a result, no reasonable jury could find that that Shao's continued use of the marks was anything other than willful. *See id.*

**C.    Damages**

Having determined that summary judgment for UL is appropriate on liability and the issue of willfulness, the Court turns finally to the question of damages. Because it has demonstrated that Shao willfully counterfeited, UL has opted for statutory damages under 15 U.S.C. § 1117(c). Under that provision, the Court may award anywhere from $1,000 to $2,000,000 per trademark willfully infringed. "Section 1117 confers a wide scope of discretion on the district court in fashioning a remedy for a trademark

infringement subject to the principles of equity." *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 746 (7th Cir. 1985). UL proposes that the Court consider the "common formulation" used in *Sara Lee Corp. v. Bags of New York, Inc.*, 36 F. Supp. 2d 161 (S.D.N.Y. 1999). There, the district court assessed (1) available monetary data related to the infringement; (2) the defendant's willfulness; and (3) deterrence. *Id.* at 166.

UL asks the Court to award it $1,000,000 in damages. Calculating based on the profits Shao has admitted to making, UL further suggests that it should in no case receive less than the $381,000 of damages—roughly three times the profit Shao admitted AEP made from sales of products bearing the UL marks—that it could have opted for under 15 U.S.C. § 1117(b).

Shao does not address the issue of damages in his submissions beyond conceding, by omission, the sales and profits figures provided by UL. *See* Def.'s Rule 56.1 Stat., dkt no. 122, ¶ 66-67; *see also Graziano v. Village of Oak Park*, 401 F. Supp. 2d 918, 936 (N.D. Ill. 2005) (noting that a non-moving party's failure to properly deny an assertion in their response to a Local Rule 56.1 statement amounts to an admission); *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004) (discussing minimum requirements for denying an allegation made in a moving party's Local Rule 56.1 statement).

The Court concludes that the appropriate damage award is $500,000. This is well short of UL's proposal but strikes the appropriate balance of the equities. The undisputed record established that at least $121,000 profits flowed from misuse of UL's marks, which could have been trebled under section 1117(b). Likewise, the record

establishes that the misuse was willful.  The $500,000 damages amount places a significant cost on Shao's willful conduct, awarding UL an extra $113,000 beyond treble the value of profits earned by misuse of the marks.

The goal of deterrence does not warrant a higher damages award.  The record suggests that sale of Sky Blue Butane products has long since ceased, so the importance of specifically deterring Shao from misusing UL's marks in the future is relatively minimal.  And the Court is satisfied that this significant monetary damage award will serve to deter others from misusing UL's marks in the future.

## Conclusion

For the foregoing reasons, the Court grants UL's motion for summary judgment [dkt. no. 105].  The Court directs the Clerk to enter judgment in favor of plaintiff UL LLC and against defendant Jude Shao in the amount of $500,000.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  January 16, 2019